UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
ALPROF REALTY LLC and VFP REALTY LLC,

                Plaintiffs,                        NOT FOR PUBLICATION
                                                                **MEMORANDUM & ORDER**
    -against-                                         09-CV-5190 (CBA) (RER)

CORPORATION OF THE PRESIDING
BISHOP OF THE CHURCH OF
JESUS CHRIST OF LATTER-DAY SAINTS,

                Defendant.
------------------------------------------------------------------x
AMON, United States District Judge.

      Plaintiffs Alprof Realty LLC and VFP Realty LLC bring this action against defendant Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints ("the Church"). The case arises from the contamination of properties owned by the plaintiffs (the "Alprof property" and the "VFP property") resulting from a spill of hazardous substances on the Church's property (the "Church property") that migrated onto the plaintiffs' neighboring properties via groundwater. The plaintiffs seek damages, response costs, and injunctive relief under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.*, and various state laws. The Church in turn asserts counterclaims to recover partial response costs from the plaintiffs. This memorandum and order resolves (1) the Church's motion to dismiss the plaintiffs' amended state law claim for restitution; and (2) the plaintiffs' motion to dismiss the Church's amended counterclaims. (Id. ¶ 60.)

## I. BACKGROUND

### A. Facts

      The following facts are alleged in the plaintiffs' Amended Complaint and are taken as true at the motion to dismiss stage. The parties purchased their respective properties in 2002.

(Am. Compl. ¶¶ 6, 9, 31.) The Alprof property is adjacent to the west side of the Church property. (Id. ¶ 5.) The VFP property, in turn, is adjacent to the west side of the Alprof Property. (Id. ¶ 8.) The groundwater in this area flows in a westerly direction, from the Church property towards the Alprof and VFP properties. (Id. ¶ 14.)

At some time before any of the parties owned their respective properties, contaminants—including trichloroethylene, vinyl chloride, petroleum, and other hazardous substances—were spilled or discharged on the Church property, primarily in the southwest quadrant next to the Alprof property. (Id. ¶ 13.) None of the parties to this action were responsible for the contamination. However, there is no dispute that the soil on the Church property is contaminated, and that the Church was aware of this at the time it purchased the property. (Id. ¶¶ 22, 32.) An investigation conducted by environmental consultants working on behalf of the Church revealed that the Church property formerly housed an above ground storage tank and industrial buildings. (Id. ¶¶ 20, 21.)

In 2004, the Church's environmental consultant, Anson Environmental, Inc. ("Anson"), undertook an excavation of the contaminated soil and removed 12,430 gallons of a petroleum/water mixture from an area on the western edge of the Church property. (Id. ¶ 34.) Two underground storage tanks were discovered and removed. (Id. ¶ 36.) Subsequently, 418 tons of contaminated soil were disposed of as hazardous waste. (Id. ¶ 40.) Anson recommended further groundwater testing to determine the quality of the groundwater. (Id. ¶ 41.)

The Church did not begin testing the groundwater until late 2006—two years after the contaminated soil was removed. (Id. ¶ 42.) By letter dated January 15, 2007, Anson informed Alprof that it had detected contaminants in the groundwater only a few feet from the Alprof property and that the Church wanted to conduct testing on the Alprof property. (Id. ¶¶ 43, 45.) The plaintiffs allege that prior to the receipt of this letter Alprof was unaware of the contamination on the Church property and its likely spread to the Alprof property. (Id. ¶ 47.)

2

On January 26-27, 2007, Anson tested the soil and groundwater on the Alprof property. (Id. ¶ 48.) The tests revealed extensive groundwater contamination. (Id. ¶¶ 48-50.) The plaintiffs allege that these contaminants migrated via groundwater from the Church's property to the Alprof property, and either onto or in a position to imminently threaten the VFP property. (Id. ¶ 16.)

### B. The plaintiffs' claims

Contamination persists on the Alprof property. (Id. ¶ 60.) The plaintiffs believe that the Church bears the responsibility for cleaning up the contamination on both the Church and Alprof properties. They allege that the Church's response to the contamination has been unreasonably slow, and that the Church has been unwilling to devote necessary funding and urgency to the situation, causing various harms to the plaintiffs. (Id. ¶ 54.)

The plaintiffs filed their original complaint on November 25, 2009, which asserted ten causes of action against the Church. The plaintiffs asserted causes of action under CERLCA (count one), New York State Navigation Law Article 12 ("Oil Spill Law") (counts two and three), New York Environmental Conservation Law ("ECL") Article 37 (count four), as well as common law claims for strict liability (count five), negligence (count six), public nuisance (count seven), private nuisance (count eight), equitable or implied indemnification (count nine), and restitution (count ten).

In an oral ruling on January 26, 2011, the Court dismissed counts three, four, five, and nine of the plaintiffs' complaint. The Court also dismissed the plaintiffs' tenth cause of action for restitution, but granted the plaintiffs leave to re-plead that claim.

On May 3, 2011, the plaintiffs filed their Amended Complaint, now the operative pleading, asserting six causes of action. Count one seeks a declaratory judgment that the defendant is strictly liable under CERCLA for the investigation, cleanup, remediation and removal of the contamination and an order directing the defendant to pay for all past and future

response costs incurred by the plaintiffs. The second through fifth causes of action seek the same relief under New York's Oil Spill Law (count two) and common law theories of negligence (count three), public nuisance (count four), and private nuisance (count five). Count six—the amended restitution claim—asserts that "defendant should make restitution to plaintiffs for some or all off [sic] of their expenses, costs, and damages, to the extent not recoverable under CERCLA." (Am. Compl. ¶¶ 104-108.)

The Church moves to dismiss only the plaintiffs' amended claim for restitution.

### C.     The Church's counterclaims

On April 14, 2011, the Church filed a First Amended Answer to Plaintiff's Complaint and Counterclaims, asserting four counterclaims against the plaintiff. The Church seeks to hold the plaintiffs strictly and jointly liable under § 107 of CERCLA for the costs of responding to the contamination on the Church and Alprof property (count one). The Church also asserts that it is entitled to contribution from the plaintiffs under § 113 of CERCLA for its past and future costs in responding to the contamination (count two). Finally, the Church asserts state law claims for contribution (count three) and unjust enrichment (count four). The plaintiffs move to dismiss all of the counterclaims asserted by the Church.

## II. THE CHURCH'S MOTION TO DISMISS

"Under New York law, '[a] person who has performed the duty of another by supplying things or services although acting without the other's knowledge or consent is entitled to restitution from the other if . . . the things or services supplied *were immediately necessary to satisfy the requirements of public decency, health, or safety*.'" Chase Manhattan Bank, N.A. v. T&N PLC, 162 F.3d 1147 (2d Cir. 1998) (emphasis added) (quoting City of New York v. Lead Indus. Assoc., Inc., 644 N.Y.S.2d 919, 922 (N.Y. App. Div. 1996). The Church argues that the plaintiffs' restitution claim fails because the Amended Complaint does not adequately allege that the plaintiffs performed any duty that was the Church's duty to perform or that the plaintiffs took

any action that was "immediately necessary to satisfy the requirements of public decency, health, or safety."[1] The plaintiffs have failed to meet this argument.

The plaintiffs allege as the basis for their claim of restitution that hazardous contamination leaked from the Church's property into the groundwater on the Alprof Property and either onto the VFP Property, or into a position to threaten the groundwater on the VFP Property. According to the plaintiffs, the Church has failed to promptly and adequately respond to the contamination. Notably absent from the plaintiffs' complaint, however, is any factual allegation that the plaintiffs themselves have undertaken efforts to clean up the contamination. Even if it was the Church's duty to clean up the contamination, the plaintiffs have not alleged that they performed that duty in the Church's stead. The plaintiffs have not pointed to any authority to support the proposition that a restitution claim is viable in a hazardous waste case where the plaintiff did not undertake any effort to actually clean up the contamination.

The plaintiffs allege generally that they have "incurred response costs to respond to the Contamination." (Compl. ¶ 69i.) However, the only costs identified are "expenditures in the neighborhood of $50,000 for [plaintiffs'] environmental lawyers and other environmental consultants to investigate and assess the threats to the environment and public health posed by the Contamination and identify responsible parties." (Id.) The plaintiffs argue that the hiring of consultants and attorneys was a necessary prerequisite to the remediation of the contamination because the extent of the contamination needed to be fully analyzed before addressed. However, the plaintiffs also allege in their complaint that the Church hired at least three environmental consultants to investigate and determine the extent of the contamination, including the contamination on the Alprof property. (Id. ¶¶ 21, 22, 25, 30, 48.) There is no allegation that this

---

[1] The plaintiffs argue that under § 30(2)(a) of the most recent version of the Restatement (Third) of Restitution and Unjust Enrichment, restitution is available for "unrequested but justifiable intervention" that "spares the recipient a necessary expense." However, no New York court has adopted this restatement provision. To the contrary, there is ample precedent holding that a restitution claim arises under New York law only when a plaintiff makes expenditures that were immediately necessary to protect the public. See New York v. West Side Corp., 790 F. Supp. 2d 13, 32 (E.D.N.Y. 2011); New York v. Hickey's Carting, Inc., 380 F. Supp. 2d 108, 121 (E.D.N.Y. 2005).

investigation was a sham or even deficient. Accordingly, the Court finds implausible the plaintiffs' suggestion that any additional expenditure on consultants and attorneys was, as the law requires, immediately necessary to satisfy the requirements of public decency, health, or safety. For these reasons, the Church's motion to dismiss the plaintiffs' restitution claim is granted.

### III. THE PLAINTIFFS' MOTION TO DISMISS

The plaintiffs move to dismiss the Church's First Amended Counterclaims, filed on April 14, 2011. (Dkt. No. 37.) As explained herein, the First Amended Counterclaims seek to hold the plaintiffs responsible under CERCLA and state law for sharing the costs incurred by the Church for cleaning up the contamination. The theory underlying the First Amended Counterclaims is that the spread of contamination from the Church property to the Alprof property makes the Alprof property part of the single CERCLA "facility" at issue in this case, and therefore makes Alprof responsible for clean-up costs as a current owner of that CERCLA facility.

While the plaintiffs' motion to dismiss the First Amended Counterclaims was pending, the Church moved to amend the factual allegations underlying its counterclaims based on information that was revealed during the course of discovery. (Docket No. 76.) The Court granted the Church's motion to amend on May 4, 2012. The Second Amended Counterclaims, filed on May 7, 2012, allege that there are sources of contamination on the Alprof property that are unrelated to the contamination that migrated from the Church property, and that may instead have come from the neighboring VFP property or some other source. (Sec. Am. Countercl. ¶¶ 4-11.) According to the Church, these independent sources of contamination provide another basis for holding the plaintiffs responsible for clean-up costs under CERCLA. At oral argument on the plaintiffs' motion to dismiss the First Amended Counterclaims, the Court provided the parties with the opportunity to provide limited additional briefing concerning the legal implications of the new factual allegations.

6

For the following reasons, the Court dismisses the First Amended Counterclaims for failure to state a claim upon which relief can be granted. In addition, having reviewed the parties' most recent submissions, the Court finds that the additional facts alleged in the Second Amended Counterclaims do not alter this result, and the Court dismisses the Second Amended Counterclaims as well.

### A. The Church's First Amended CERCLA Counterclaims

The Church's First Amended Counterclaims assert claims against the plaintiffs under § 107 and § 113 of CERCLA, arguing that the plaintiffs are responsible for at least some of the cost of responding to the contamination on the properties at issue in this case. Section 107 of CERCLA permits any party that has incurred necessary environmental response costs to seek reimbursement of those costs from four categories of potentially liable persons set forth in 42 U.S.C. § 9607(a), often referred to as "potentially responsible parties" or "PRPs." Schaefer v. Town of Victor, 457 F.3d 188, 194 (2d Cir. 2006). Section 113, in turn, permits any PRP who has been sued under § 107 of CERCLA to seek contribution from other PRPs, including the plaintiff where appropriate. Id. at 196.

To succeed on an action under § 107 of CERCLA, a plaintiff must establish the following elements:

> (1) defendant fits one of the four classes of responsible parties outlined in § 9607(a); (2) the site is a facility; (3) there is a release or threatened release of hazardous substances at the facility; (4) the plaintiff incurred costs responding to the release or threatened release; and (5) the costs and response actions conform to the National Contingency Plan set up under [CERCLA] and administered by the EPA in order to prioritize hazardous substance release sites throughout the nation.

B.F. Goodrich Co. v. Murtha, 958 F.2d 1192, 1198 (2d Cir. 1992). As to the first element, the current "owner and operator of a vessel or a facility" falls within the classes of persons upon

whom § 9607(a) imposes strict liability for the cost of responding to contamination. See § 9607(a)(1). As to the second element, a CERCLA facility is defined as:

> (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9). Finally, subject to certain exclusions, a "release" of hazardous substances "means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment . . . ." § 9601(22).

There is no dispute that the Church property is a facility at which there has been a release of hazardous substances. The dispute in this case centers on how the boundaries of that facility should be defined, a fact critical to determining the owners that can be held responsible for the clean-up costs. Contamination indisputably has spread from the Church property onto the Alprof property. The Church argues that this fact, alone, makes the Alprof property part of the same CERCLA facility as the Church property. The Church contends that a facility is defined by the physical boundaries of the contamination and therefore the Alprof property and Church property together constitute a single facility, and Alprof, as a current owner of part of that facility, should be responsible for sharing the cost of cleaning up "the facility that consists of the two properties together." (Tr. of 5/4/11 Hr'g at 12.)

It is undisputed that the Alprof property does falls within the statutory definition of a facility because it is "a site . . . where a hazardous substance has . . . come to be located." § 9601(9). Critically, however, the Church does not seek to have the Alprof property designated as a *separate* CERCLA facility from the Church property. If the Alprof property is designated as its own facility, separate and apart from the Church property, then under the facts alleged in the First Amended Counterclaims there has been no "release" at that facility—one of the essential

8

elements of a CERCLA claim. The Church conceded at oral argument that in order for the First Amended Counterclaims to withstand the plaintiffs' motion to dismiss the two properties must be designated part of the same CERCLA facility. (Tr. of 5/4/11 Hr'g at 19.) The Church argues that a contiguous geographical area of contamination always constitutes a single facility under CERCLA, regardless of whether it crosses property lines and regardless of which property the contamination originated from. The plaintiffs, on the other hand, argue that the migration of contamination from its source across property lines does not render separate properties—that have always been separately owned and operated—part of a single CERCLA facility. For the reasons set forth below, the Court rejects the claim that the parties' properties constitute a single facility.

This Court finds persuasive the reasoning of Niagara Mohawk Power Corp. v. Consolidated Rail Corp. ("Consolidated Rail"), 291 F. Supp. 2d 105 (N.D.N.Y. 2003), rev'd on other grounds Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc., 596 F.3d 112 (2d Cir. 2010), which involved facts similar to those presented in this case. The plaintiff, Niagara Mohawk Power Corporation ("Niagara Mohawk"), or its predecessors, operated a manufactured gas plant in the 1920s on a large site along the Hudson River in New York. Id. at 114. In the early 1990s, Niagara Mohawk entered into an Order on Consent with the New York State Department of Environmental Conservation to develop and implement plans for remediating hazardous waste contamination on the site. Id. at 112. Niagara Mohawk later brought an action pursuant to § 107 of CERCLA against various current and prior owners of portions of the site (which had since been broken up into separate parcels) seeking to recover its response costs. Niagara Mohawk sought to designate as part of the manufactured gas plant facility an adjacent parcel of land onto which contamination from the plant had migrated. Id. at 114-15. As the Church does here, Niagara Mohawk sought to hold the owner of the adjacent property,

Consolidated Rail Corporation ("Conrail"), liable under CERCLA as the owner of the facility. Id.

The district court reasoned that "[s]eparate parcels should be considered as a single facility if they 'cannot be reasonably or naturally divided into multiple parts or functional units[,]'. . . [but] where parcels are naturally divisible into parts or functional units they should not be considered as a single facility." Id. at 125 (quoting United States v. 150 Acres of Land, 204 F.3d 698, 709 (6th Cir. 2000)). The court explained that Conrail's adjacent property had never been owned or operated in conjunction with the manufactured gas plant. Id. Conrail's property was "naturally divisible" from the manufactured gas plant property, and "at least in the last 150 years had no connection with the property upon which the [manufactured gas plant] operated." Id. The court rejected Niagara Mohawk's attempts to integrate Conrail's property into the facility in order to hold Conrail liable under CERCLA as an owner. Id.

The Church attempts to distinguish Consolidated Rail because the plaintiff in that case, Niagara Mohawk, was responsible for the pollution and was seeking contribution from a neighbor whose land it polluted, whereas neither party in this case caused the contamination. Although this is a distinction between the two cases, it is one that has no relevance. Nothing in the language of the statute suggests that the boundaries of a CERCLA facility should change depending on whether, in a given case, the party seeking to impose liability caused the contamination. Accepting the Church's position would lead to the absurd result in which every neighboring landowner whose property has become contaminated by migrating hazardous substances could be held liable under CERCLA for the cost of cleaning up the entire area of contamination as soon as a party who causes the contamination sells its property. If a neighbor is not liable when the party responsible for the contamination owns the contaminated property, that neighbor should not become liable simply because the responsible party sells the site. See Consolidated Rail, 291 F. Supp. at 105 (reasoning that "it would be an irrational result if the

10

owner of an adjacent, contaminated property . . . were designated part of the CERCLA facility, thus subjecting the owner to liability for all of the contamination at the entire facility, 'absent any relationship to the party or its property'") (quoting City of Portland v. Boeing Co., 179 F. Supp. 2d 1190, 1201 (D. Or. 2001); see also Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 178 (2d Cir. 2003) ("'If a person merely controlled a site on which hazardous chemicals have spread without that person's fault, that person is not a polluter and is not one upon whom CERCLA aims to impose liability.'") (quoting ABB Industrial Systems, Inc. v. Prime Technology, Inc.,120 F.3d 351 (2d Cir. 1997)).

The Church cites a number of other cases to support its argument that a CERCLA facility must always be defined by the geographic bounds of the contamination. In each case cited by the Church, however, the specific relationship between the properties, the parties, and the contamination was critical to the courts' definition of the facility boundaries, relationships that do not exist in this case. For example, the Church argues that the Fifth Circuit's decision in Tanglewood East Homeowners v. Charles-Thomas, Inc., 849 F.2d 1568 (5th Cir. 1988), establishes that separately owned properties are always part of the same facility when contamination has come to be located on all of the properties. In Tanglewood, the plaintiffs were current owners of property lots in a subdivision that had been built on a large site upon which hazardous waste had accumulated. Id. at 1571. The Fifth Circuit treated the entire subdivision as one CERCLA facility, despite the fact that each plot was owned by a different homeowner, because the entire site of the subdivision had been operated as a single wood-treatment facility for over 25 years before the subdivision was built, the contamination all came from that same plant, and the site was developed as a single residential development. Id. No similar relationship exists between the properties at issue in this case.

Similarly, in New York v. Westwood-Squibb Pharmaceuticals, 138 F. Supp. 2d 372 (W.D.N.Y. 2000), upon which the Church also relies, the district court defined the CERCLA

facility to include a property that once held a manufactured gas plant ("Westwood Property"), as well as an adjacent creek property. In that case, however, the manufactured gas plant that once operated on the Westwood Property had utilized a complex underground pipeline system through which hazardous waste was directly deposited into the adjacent creek, which was a public waterway, for a period of fifty years. Id. at 376. The primary issue in Westwood-Squibb was whether the Westwood Property was a separate facility from the manufactured gas plant, including its underground pipes and tanks. Id. at 380. The court "declined to divide the Westwood Property and Manufactured Gas Plant into separate facilities." Id. The court went on to conclude that it was "inescapable" that the creek was contaminated by direct discharges from the pipeline, and that the creek property was thus part of the facility that included the manufactured gas plant, and thus part of the same facility as the Westwood Property. Id. at 381. The district court further elaborated, in *dicta*, that groundwater had also carried contaminants from the Westwood Property to the creek, lending further support to the conclusion that the properties constituted a single CERCLA facility. Id. at 381-82. However, this case does not establish that two properties necessarily become a single CERCLA facility merely because contamination migrates through groundwater from one to another. Rather, it was once again the unique facts of the case—in particular the underground pipeline that connected the properties and the direct discharge of contamination through that pipeline—that informed the court's definition of the CERCLA facility at issue.

  The cases cited by the parties establish that a contaminated site that is or was managed as a whole constitutes a single facility for CERCLA purposes—regardless of whether the area crosses property lines—and that a widely contaminated area should not unnaturally be divided into multiple facilities in order to limit a party's liability. See, e.g., United States v. Township of Brighton, 153 F.3d 307 (6th Cir. 1998) (holding that an entire 15-acre property that operated as one garbage dump was appropriately classified as a single CERCLA facility, even where the

defendant only disposed of waste in a 3-acre portion of the lot); Sierra Club, Inc. v. Tyson Foods, 299 F. Supp. 2d 693, 708-09 (W.D. Ky. 2003) (noting that "if an area is managed as a whole, it is a single facility for CERCLA purposes"); Clear Lake Prop v. Rockewell Int'l Corp., 959 F. Supp. 763, 767-78 (S.D. Tex. 1997) (refusing to create an "unnatural boundar[y]" between buildings on a property and the soil and groundwater underneath it); Axel Johnson, Inc. v. Carroll Carolina Oil Co., 191 F.3d 409, 418 (4th Cir. 1999) (rejecting argument that each barrel in a landfill should be designated a separate facility because "[c]ourts have uniformly refused to divide widely contaminated properties like the one at issue here into separate facilities in response to a party's claim to be responsible for contamination in only certain parts of the property"); Cytec Indus., Inc. v. BF Goodrich Co., 232 F. Supp. 2d 821, 835-36 (S.D. Ohio 2002) (designating entire 54-acre site on which chemical plant and waste disposal facilities were operated as a single facility despite the presence of 28 separate areas of waste disposal because "the broadest geographical definition of a facility that is appropriate under the specific facts and circumstances of a given case would likely best advance CERCA's . . . underlying purposes").

If the Alprof Property, the VFP property, and the Church property had been owned and operated together as a single waste disposal facility that caused hazardous substances to be released onto all three properties, then the cases cited by the Church might suggest that the entire site should be designated a single CERCLA facility for liability purposes. However, no such relationship between the properties is alleged in this case. The cases cited by the Church do not establish that a CERCLA facility must always be defined to include the entire area of contamination, and they particularly do not stand for the proposition that an unrelated neighboring property onto which contamination spreads becomes part of the CERCLA facility. Thus, to the extent the Church's CERCLA counterclaims rely on allegations that contamination migrated from the Church property to the Alprof property, the Court finds that the Alprof property is not part of the same facility as the Church property. Accordingly, Alprof cannot be

13

held liable as an owner of the CERCLA facility that encompasses the Church property, and the Church's counterclaim brought pursuant to § 107 of CERCLA is dismissed.

In its supplemental briefing to the Court, the Church stated that "if the Court concludes that the Alprof and Church properties are two distinct CERCLA facilities, the Church would voluntarily dismiss its contribution claim brought pursuant to § 113 of CERCLA." (Docket No. 90 at 2.) Accordingly, the Church's contribution claim under § 113 is also dismissed.

### B. The Church's Second Amended CERCLA Counterclaims

In its Second Amended Counterclaims, the Church again asserts claims for relief under both § 107 and § 113 of CERCLA, but amends the factual allegations underlying those claims. The Church now alleges that there are sources of contamination on the Alprof property independent of any migration from the Church property. (Sec. Am. Countercl. ¶ 11.) The Church bases these new allegations on an environmental report produced during discovery that indicates that soil samples were collected from the Alprof property from a location that could not have been contaminated by groundwater flowing from the Church's property. (Id. ¶ 8.) The Church alleges that these soil samples contained significant contamination. (Id. ¶ 9.) The Church alleges upon information and belief that hazardous material from a gasoline station and automobile repair shop formerly operated on the VFP property may have been discharged directly onto the Alprof property, causing this independent contamination. (Id. ¶¶ 3-5.)

As an initial matter, the new allegations in the Second Amended Complaint do not alter the Court's conclusion that the Alprof Property and the Church Property constitute two separate CERCLA facilities. No cases support the proposition that two neighboring properties that have been contaminated by wholly independent sources of contamination should be treated as a single CERCLA facility. As explained herein, the Church has agreed to voluntarily dismiss its contribution claim brought pursuant to § 113 of CERCLA upon a finding that the Alprof and Church properties are two distinct CERCLA facilities, and thus the § 113 claim asserted in the

Second Amended Counterclaims is dismissed. The question remains, however, whether the amended allegations state an affirmative claim for relief under § 107 of CERCLA, which requires the Church to allege that the Alprof property is a facility from which there has been a release or threatened release of hazardous substances, that the Church incurred costs responding to that release, and that the responsive actions taken conform to the National Contingency Plan. B.F. Goodrich Co., 958 F.2d at 1198.

Assuming the Church has adequately alleged that the Alprof property is a CERCLA facility from which there has been a release in the form of an independent source of contamination, the Church's amended allegations fall short of plausibly alleging that the Church incurred costs responding to contamination caused by that independent source of contamination. See Dedham Water Co. v. Cumberland Farms Dairy, Inc., 889 F.2d 1146, 1153 (1st Cir. 1989) (holding "that under CERCLA the question is whether the release or the threatened release by a defendant has caused a plaintiff to incur response costs."); see also City of Portland v. the Boeing Company, 179 F. Supp. 2d 1190, 1201 (D. Ore. 2001) ("[B]efore a party may be liable to another for response costs, the party seeking to impose liability must show that the alleged releases caused them to incur response costs that were necessary and consistent with the national contingency plans."). In City of Portland, for example, the district court held that the fact that the plaintiff's property had been contaminated by independent sources did not make it a potentially responsible party under CERCLA "in the absence of a showing that *that particular release of hazardous materials* caused Defendants to incur response costs." 179 F. Supp. 2d at 1201 (emphasis added).

If the Church was alleging that the independent source of contamination on the Alprof property had caused contamination or threatened to cause contamination on the *Church* property, and that the Church had incurred costs to respond to this contamination or threat thereof, then perhaps the Second Amended Counterclaims would state a claim for relief against the plaintiffs

15

under § 107 of CERCLA. However, the Church expressly acknowledged at oral argument it is not making this allegation. (Tr. of 5/4/11 Hr'g at 12 ("we are not claiming that the [contamination] that got into the ground water on [the Alprof] property went up gradient to [the Church property]").)

Instead, the Church alleges in a conclusory fashion that "the Church has incurred and will incur costs to respond to the release or threatened release of hazardous substances and/or petroleum at Plaintiffs' Properties." (Second Am. Countercl. ¶ 21.) However, the Second Amended Counterclaims contain no factual allegations which support those purported costs. The Church elaborated at the most recent conference before the Court that these costs include money spent drilling wells and performing tests on the Alprof property to investigate the scope of contamination in the ground water, as well as remedial work done on the Church property at the border of the Alprof property, which the Church claims has reduced the contamination on the Alprof property. (Tr. of 6/28/12 Hr'g at 3.) It is clear from the face of the pleadings and the parties' arguments that these actions were not taken "in response to" the alleged independent source of contamination from the Alprof property. The Second Amended Counterclaims contain no allegations suggesting that the Church took these measures out of some concern that the independent source of contamination threatened to migrate to or otherwise damage the Church property. Rather, it was the contamination on the Church's own property and the potential migration of that contamination that necessitated this responsive action. Indeed, the Court notes that the Church did not even discover that there might be another source of contamination until long after it had taken these alleged remedial measures. That the remedial measures taken may have incidentally benefited the plaintiff and/or led to the discovery of another source of contamination on the Alprof property does not mean that the release from the Alprof property caused the Church to incur these response costs.

Finally, in its supplemental briefing to the Court, the Church quotes from certain Second Circuit opinions to argue that a plaintiff asserting a CERCLA claim is "'not required . . . [to] show that a specific defendant's waste caused incurrence of clean-up costs.'" (Docket No. 90 at 3 (quoting United States v. Alcan Aluminum Corp., 990 F.2d 711, 721 (2d Cir. 1993) and citing Prisco v. A&D Carting Corp., 168 F.3d 593, 603 (2d Cir. 1999)). Each of those cases, however, involved a single CERCLA facility onto which multiple parties had disposed of hazardous waste. The Second Circuit held only that a party who disposes of hazardous waste on a CERCLA facility can be held liable under the statute without regard to whether the waste deposited by that particular defendant actually caused the release or threatened release that necessitated the response costs. Alcan, 168 F.3d at 721; Prisco, 168 F.3d at 606. Instead, CERCLA makes classes of persons strictly liable without reference to whether they caused the release. Id. These cases do not address the distinct causation element of an affirmative CERCLA claim that the party seeking to impose liability must have incurred response costs as a result of the release or threatened release at issue—here, the independent source of contamination on the Alprof property.

The presence of an independent source of contamination on the Alprof property may ultimately prove relevant to the calculation of damages incurred by the plaintiffs as a result of the migrating contamination from the Church property, as opposed to an independent source for which the Church could not be held liable. See City of Portland, 179 F. Supp. 2d at 1999-2000 (holding that arguments about an independent source of contamination on plaintiff's property "are more appropriately directed to the issue of the amount of damages incurred by Plaintiff as a result of Defendants' activities"). However, allegations about an independent source of contamination that did not cause the Church to incur response costs cannot form the basis of an affirmative CERCLA claim. Accordingly, the Church's Second Amended CERCLA Counterclaims are dismissed.

17

### C. The Church's Contribution Claim

To succeed on a state law contribution claim against the plaintiffs, the Church must establish that the plaintiffs owed the Church a duty to contribute to the cost of cleaning up the contamination that originated from the Church's property. See Marist College v. Chazen Envtl. Servs., Inc., 923 N.Y.S.2d 695 (N.Y. App. Div. 2011) (dismissing common-law contribution claim for failure to allege duty). The Church argues that "Plaintiffs here are liable as current owners of part of a CERCLA facility" and thus have a legal duty to respond to the contamination. This claim fails for the same reasons as the Church's First Amended CERCLA Counterclaims: the plaintiffs' properties are not part of the CERCLA facility that encompasses the Church property, and thus the plaintiffs are not liable to the Church as owners of that facility. Because the plaintiffs had no legal duty to clean up the contamination on the Church's property, the Church fails to state a claim for contribution under state law.

### D. The Church's Unjust Enrichment Claim

"'Under New York law, a plaintiff asserting a claim of unjust enrichment must show that the defendant was enriched at the plaintiff's expense and that equity and good conscience require the plaintiff to recover the enrichment from the defendant.'" Giordano v. Thomson, 564 F.3d 163, 170 (2d Cir. 2009) (quoting Golden Pac. Bancorp v. FDIC, 375 F.3d 196, 203 n. 8 (2d Cir.2004)). Once again, the theory underlying the Church's unjust enrichment claim is that both the plaintiffs and the Church should be held responsible for cleaning up the contamination of the facility that consists of both the Alprof and the Church property together, but that only the Church has expended any costs to remedy the contamination. The Church argues that it would be inequitable for the plaintiffs to retain the benefits of the Church's clean-up efforts without paying their fair share of the costs.

The Church's counterclaim for unjust enrichment must fail for the same reasons as its other counterclaims. It cannot be said that the plaintiffs "unjustly" benefitted from the Church's

efforts to clean up their own property, even if those clean-up efforts incidentally benefitted the plaintiffs. Under the facts of this case, particularly where the Church knew it was purchasing contaminated property, equity and good conscience do not require the plaintiffs to reimburse the Church for the costs it incurred responding to the contamination that originated from its own property and that spread onto unrelated, neighboring properties. Accordingly, the Church's unjust enrichment claim is dismissed.

## IV. CONCLUSION

The defendant's motion to dismiss the plaintiff's amended claim for restitution is granted. The plaintiffs' motion to dismiss the Church's counterclaims is granted. The Court dismisses the First Amended Counterclaims and the Second Amended Counterclaims in their entirety.

Dated: Brooklyn, New York
September 12, 2012

s/CBA
Carol Bagley Amon
United States District Judge